**46**

**MULTIFASTENER CORPORATION, William E. Strain, and Jerry H. Steward, Plaintiffs,**

v.

**David L. LADD, Commissioner of Patents, Defendant.**

Civ. A. No. 143-63.

United States District Court
District of Columbia.

May 7, 1964.

Andrew B. Beveridge, Browne, Schuyler & Beveridge, Washington, D. C., for plaintiffs.

Clarence W. Moore, Sol., U. S. Patent Office, Washington, D. C., for defendant.

JACKSON, District Judge.

This is a civil action under 35 U.S.C. § 145 on which plaintiffs, William E. Strain and Jerry H. Steward as joint applicants, and Multifastener Corporation as assignee, of United States patent application Serial No. 749,082, filed July 17, 1958 for "CLINCH NUT", seek to have the Court authorize the defendant, Commissioner of Patents, to issue to the assignee United State Letters Patent containing claims 1, 2 and 6 of said application.

The invention described in the application relates to a nut constructed for installation in a sheet metal panel. The nut enables other metal parts to be bolted to the panel. The nut has a rectangular base providing two flanges extending outwardly at opposite sides of a substantially square pilot which projects upwardly from the base. Two shallow grooves are cut in the opposite sides of the pilot between the flange and a parallel shoulder at the upper end of the pilot. The function of the grooves is to provide a means for retaining the nut in a sheet metal panel. A tapped bore extends vertically through the pilot portion and the base. The nut is installed in a sheet metal panel by a conventional punch press which drives the pilot portion of the nut through the panel until the base flanges engage one side of the panel, the top of the pilot portion at that time projecting beyond the opposite side of the panel. The nut punches its own hole in the panel, hence the name "pierce nut". A die button on the punch press engages the panel at the side from which the pilot projects, and as the pilot punches through the panel, ridges on the die button swage metal of the panel into the undercut grooves on the pilot to permanently retain the nut and the panel in assembly.

Claim 1, the principal claim in the case, reads as follows:

"1. A piercing nut of tough material, such as steel, for use in a fastening and piercing operation with a panel of tough material, such as steel, comprising a rectangular body having two oppositely extending flanges one extending from each end of said nut, said body having two separate shallow grooves undercut therein one extending between each such flange and a point near the top of said body to provide a wall at the base of each of said grooves and a thick, short shoulder at the top of said body adjacent each of said grooves, the distance between the top of said body and the top surface of each flange being between two and three times the thickness of each shoulder, the sides of said body being substantially smooth and flat, said walls extending from said flanges to said shoulders and said shoulders being sufficiently thick to provide the necessary strength for withstanding a piercing operation, said shoulders also being constructed to provide a substantially square top face on said nut which top face is surrounded by flat vertical sides extending downwardly therefrom so that the periphery of said top face provides an efficient substantially squared piercing edge for piercing a suitable hole in a panel, said body also having a threaded hole therethrough which is surrounded on all sides by sufficient material in structurally sound proportion to prevent distortion of the threads when the nut is used in the piercing operation."

Claim 2 adds to claim 1 the requirement that the inner surfaces of the flanges are flat and parallel to the bottom face of the nut. Claim 6 adds to claim 2 the limitations that the nut is constructed of cold formed material, that the top and bottom faces of the nut are substantially parallel, and that the inner faces of each flange and the adjacent shoulder are parallel to each other and also parallel to the top and bottom faces of the nut.

The claims in issue were held by the Board of Appeals of the Patent Office to be unpatentable over a patent to Muchy, No. 2,652,942, in view of the teachings of any one of three other patents. The first was to Renshaw, No. 1,842,117, the second to Hasselquist, No. 1,919,552, and the third to Jessop, No. 2,139,590. The question to be decided is that of obviousness under 35 U.S.C. § 103.

The patent to Muchy, granted in 1953, discloses a well known "clinch" nut and method for attaching the nut to a sheet metal panel in a hole pierced by the nut itself. The nut comprises a rectangular head providing two outwardly extending flanges at opposite sides of a substantially square pilot projecting from the head. The nut is attached to the panel in a two-step operation by first forcing the nut directly against the panel to pierce a hole for the pilot, and then striking and flattening the corners of the protruding end of the pilot with a die member under the panel to secure the nut in place.

The Renshaw patent, granted in 1932, discloses a joint for securing the ends of cylindrical studs to the side plates of a transmission chain link. One form of the joint comprises a reduced cylindrical neck at the end of a stud, and a slight head formed by a shoulder at the outer end of an annular groove in the reduced neck. The end of the stud is driven into a preformed hole of the same diameter in a side plate and the metal of the plate adjacent the hole is forced into the groove in the neck by a spinning or similar metal-displacing operation.

The patent to Hasselquist, granted in 1933, discloses a nut with a tapered shank, and a method of attaching the nut to a metal plate. The nut comprises a head and an elongated shank, larger at the outer end and tapering inwardly to form an angular groove with the head. The shank of the nut is inserted into a pre-formed hole in the plate, and the head of the nut is pressed against the plate

on a suitable backing to cause metal of the plate adjacent the hole to be upset and to flow into the angular groove to secure the nut to the plate.

The Jessop patent, granted in 1935, discloses a headed nut having a square shank with undercut grooves on all four sides of the shank. The nut is installed in a pre-formed square hole in a panel with the edges of the hole located on upwardly bent flaps formed by diagonally slitting the panel outwardly from the four corners of the hole. The flaps are bent upward so the shoulder at the end of the nut shank can pass through the hole. After the nut has been inserted in the hole, a bolt is threaded into the nut and tightened. The tightening of the bolt bends the flaps downwardly so that the flaps are cammed into the grooves.

As previously stated, the question to be decided here is whether it would have been obvious to a person having ordinary skill in the art to modify Muchy in accordance with the teachings of any one of the other three patents in order to achieve plaintiffs' result at the time the invention was made. 35 U.S.C. § 103.

 While proceedings in the District Court pursuant to Section 35 U.S.C. § 145 are in the nature of a trial de novo,[1] the Court is keenly aware of the presumption of correctness that attaches to Patent Office adjudications.

In Esso Standard Oil Company v. Sun Oil Company, 97 U.S.App.D.C. 154, 229 F.2d 37, 41–42 (1956), it was held that evidence presented in the District Court must carry a "thorough conviction" that the Patent Office erred. The Court went on to say, however, that "if the decision of the Patent Office is not warranted on the evidence before it, or if the new evidence reaches the necessary standard, the District Court may rule as the totality of the evidence may require".[2]

██ Returning to the question of obviousness, the Court initially observes that the Patent Office rests its rejection on a combination of references, all of which were known in the prior art. It is settled law that references may be combined to anticipate an applicant's claims, but not in the event "there is no suggestion in * * * the references that they can be combined to produce appellant's result". In re Shaffer, 229 F.2d 476, 43 CCPA 758 (1956), and In re Hortman, 264 F.2d 911, 46 CCPA 814 (1959).

It was acknowledged at trial that the patent to Muchy failed to anticipate the plaintiffs' structure in one crucial respect: the lack of means to attach the nut to the panel without employing a second press stroke for the purpose of upsetting the upper end of the pilot. To overcome this deficiency, the Patent Office suggested that any one of the three patents to Renshaw, Hasselquist or Jessop would teach the structure that the plaintiffs have provided for this attachment function.

Renshaw, the Court feels, is not properly combinable with Muchy because it is not designed to punch its own hole. It cannot be attached without first inserting it into a previously provided aperture and then spinning it in order to affix it to the aperture's sides. Renshaw also requires that the top of the groove in his pilot member be exactly aligned with the panel surface so that the spinning operation can be effective.

The patent to Hasselquist discloses a nut with a tapered shank, and would at first seem to teach that metal could be deformed in the manner plaintiffs have chosen for securing a nut in a panel member. Upon further scrutiny, however, it becomes clear that this reference would not teach such an affixing function to someone concerned with designing a nut that would pierce its own hole, because

1. Butterworth v. United States ex rel. Hoe, 112 U.S. 50, 61, 5 S.Ct. 25, 30, 31, 28 L.Ed. 656, and Hoover Co. v. Coe, 325 U.S. 79, 83, 65 S.Ct. 955, 957, 89 L.Ed. 1488 (1945).

2. See also Abbott v. Coe, 71 U.S.App.D.C. 195, 197–98, 109 F.2d 449, 451–452 (1939), and Hendrix v. Ladd, 112 U.S. App.D.C. 203, 301 F.2d 527 (1962).

the structure of the reference is expressly designed to feed into an aperture which is already provided. Moreover, the testimony in Court clearly demonstrated that Hasselquist's structure would not be operable to great advantage in environments where thin panel members might be used. This testimony showed that Hasselquist's taper would not provide holding force sufficient to retain the nut in such workpieces. It was also shown that because Hasselquist's taper extends inwardly from what would be a piercing edge (if used in the manner of Muchy), it would for that reason be ill-adapted to serve a piercing function.

The Jessop patent shows an exceedingly complex arrangement for securing a nut in a panel. Jessop does in fact have a groove into which the metal of the panel is forced during the process of attaching the nut. The entire concept of Jessop, however, is only applicable to an environment in which a hole has already been provided, and in which the metal at the edges of the hole has been bent upward to receive the groove. The fact that a bolt must be inserted into Jessop's nut before the metal will even be forced into the groove makes it highly unlikely that a man concerned with designing a self-attaching pierce nut would ever think to use such a concept to any advantage whatever.

In addition to the absence of suggestion in these secondary references that they could be combined with Muchy, there is also an absence of any suggestion in Muchy that his piercing pilot might be modified to include grooves. Muchy's disclosure, by using the upsetting feature, appears to suggest the opposite.

In view of the above, and in view of the testimony taken as a whole, the Court is thoroughly convinced that the combination of these references to produce the result achieved by the plaintiffs would not have been obvious to one skilled in the art at the time the invention was made.

Moreover, it appears to the Court that even if it were to be considered obvious to make the combination of teachings that the Patent Office has suggested, it would still not be possible to anticipate the structure of the plaintiffs even though all four references were used. The claims at issue go quite beyond a mere specification of a nut having grooves which could be used for piercing a panel member. The claims set forth grooves having specific dimensional relationships with other portions of the nut. At trial it was conclusively shown by demonstration with an actual punch press that these dimensional relationships were the critical factors that distinguished the nut designed by the plaintiffs from the prior art. The groove is formed so that it lends strength to the portion of the nut which is used for piercing, and is positioned in a way that results in metal from the panel being forced into the groove in a manner that secures the nut in place with only one stroke by the press.

None of the references, even though they all be combined, show such a groove having these critical dimensions.

In addition to the above considerations, it was shown at the trial that plaintiffs' structure, while differing only slightly from Muchy's, has enjoyed remarkable commercial success. Muchy's concept was subjected to a great deal of study and then abandoned. The juxtaposition of these facts is a strong indication to the Court that the plaintiffs have made more than a slight improvement in the concept disclosed by Muchy.

Testimony describing assembly line conditions under which the comparative utility of these nuts is put to test undisputably established that plaintiffs' nut was so revolutionary in concept that it now is standard equipment on all automobiles produced by Ford, Chrysler and General Motors.

While commercial success alone should be considered by this Court immaterial when invention is lacking, Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162 (1950), it will be given weight in doubt-

50

ful cases, Nixon v. Marzall, 87 U.S.App. D.C. 415, 186 F.2d 352 (1950).

In view of all the evidence, and after consideration of briefs by both parties, it is the opinion of the Court, in full conformance with the Esso decision, supra, that the decision of the Patent Office was "not warranted on the evidence before it", and that the "new evidence" of the actual state of the art in the industry as presented at trial "reaches the necessary standard".

It is the thorough conviction of this Court that the totality of the evidence requires a decision for the plaintiffs, and against the defendant. The Commissioner of Patents is authorized to grant a patent containing claims 1, 2 and 6 of the application.

The above Opinion includes Findings of Fact and Conclusions of Law.