William H. WOLOWITZ, Plaintiff,

v.

GULF OIL CORPORATION, Addressograph-Multigraph Corporation,

and

Harry Cobb d/b/a Cobb's Gulf Service Center, Defendants.

William H. WOLOWITZ, Plaintiff,

v.

HUMBLE OIL & REFINING COMPANY (a Corporation), Defendant.

Civ. A. Nos. 1460–63, 115–64.

United States District Court
District of Columbia.

May 31, 1966.

William D. Hall, Hall, Pollock & Van de Sande, Washington, D. C., for plaintiff.

Dana M. Raymond, Frederick C. Carver, Brumbaugh, Free, Graves & Donohue, New York City, Russell L. Root, Cleveland, Ohio, Henry T. Rathbun, Wilmer, Cutler & Pickering, Washington, D. C., for defendants.

## OPINION

JACKSON, District Judge.

This is a consolidated suit for alleged infringement of Wolowitz United States patent No. 2,582,187, granted January

8, 1952, for "Printing Machine for Duplicating Indicia." The accused machine is the familiar Addressograph Model 12–55 Data Recorder, which is manufactured by defendant Addressograph and leased to defendants Gulf and Humble for use in their gasoline service stations in conjunction with embossed customer credit cards for recording data pertaining to retail credit sales on a combination sales invoice and tabulating card, the latter to be prepared in a form ready for immediate entry into automatic machine accounting systems.

According to the record in this case, patentee Wolowitz disclosed at least some aspects of his invention to a Mr. Comegys of Addressograph in 1950, while the patent in suit was pending as an application in the Patent Office. Although Mr. Comegys is still employed by defendant Addressograph, he did not appear to testify at the trial, and the sworn testimony of Wolowitz as to the partial oral disclosure in 1950 stands uncontradicted on the record. The design of the accused machine was begun by Addressograph in 1957 or 1958, approximately five or six years after the Wolowitz patent in suit issued in 1952. The Wolowitz patent was subsequently cited as a reference against an Addressograph patent application by a Patent Office Examiner in an Office action dated June 3, 1958 (plaintiff's Exhibits 23 and 24). The status shortly thereafter of Addressograph's research and development program in connection with the accused data recorders is shown by a report by C. S. Margach, dated October 10, 1958, entitled "Summary of Gulf Meeting, September 9, 1958." (Plaintiff's Exhibit 19). Defendants' witness C. S. Margach, a Vice President of Addressograph, testified at the trial that Mr. Comegys had some role in the development of the accused machines and that the Model 12–55, and its equivalents such as the Model 12–87, constituted an "entirely new series" of imprinters when introduced on the business machines market in 1961.

Defendants rely on four major defenses in this consolidated infringement suit

as follows: (1) indefiniteness of the claims in suit under 35 U.S.C. § 112, second paragraph; (2) anticipation of the claimed subject matter under 35 U.S.C. § 102; (3) "lack of invention," which presumably means obviousness of the claimed subject matter under 35 U.S.C. § 103; and (4) noninfringement under 35 U.S.C. § 282.

The Court holds that Claims 1 to 8 of the Wolowitz patent in suit particularly point out and distinctly claim the subject matter which patentee Wolowitz regards as his invention, thus satisfying the requirements of the second paragraph of 35 U.S.C. § 112, when the claims are properly interpreted in light of the patent specification and the file history of the prosecution of the August 5, 1949 application which matured into the patent in suit. It should be noted in this respect that much of the claim language to which defendants now object was the result of two personal interviews with the Patent Office Examiner, who had objected, on other things, to the indefiniteness and incompleteness of the claims originally filed by Wolowitz. Defendants' contention that the claims are not "well-drafted" is appropriately answered by the fact that each of Claims 1 to 7, notwithstanding its length, reads word for word on the accused Addressograph Model 12–55 machine (Plaintiff's Exhibit 3).

Defendants' second defense of alleged anticipation under 35 U.S.C. § 102 is without genuine merit. None of the claims in suit reads, in all material respects, on a machine shown or fairly disclosed in a single prior art reference. In the words provided by Congress for the first time in the Patent Act of 1952, the claimed "invention is not identically disclosed or described as set forth in section 102 * * *." 35 U.S.C. § 103. It is recognized in this respect that the Wolowitz claims are directed to a new combination of individually old mechanical elements or structural features, each of which was old and known to the art prior to the 1949 filing date of the Wolowitz patent application. However, in

the absence of a single reference which either shows or fairly discloses a machine upon which the patent claims in suit may be read in all material respects, the prior art defense necessarily becomes one of alleged obviousness under 35 U.S.C. § 103, rather than one of anticipation under 35 U.S.C. § 102.

Thus, the prior art issue here becomes one of the propriety of bringing together the various component elements individually disclosed in several different prior art references to assemble a combination machine upon which the claims of the patent in suit may fairly be read in all material respects, when the claims are interpreted in light of the patent specification and the file history of the application prosecution in the Patent Office. Initially, this Court has held that it is settled law that references may be combined to anticipate claims, but not in the event that there is no suggestion in the references that they be combined to produce an inventor's results. Multifastener Corp. v. Ladd, 229 F.Supp. 46 (D.C.D.C.1964).

While defendants' witness Margach, a high school graduate with no formal technical education, testified that combination of such references as Hoffman U. S. Patent No. 1,919,219 with British Patent No. 3303 (Defendants' Exhibit 12), or Vogt U. S. Patent No. 2,606,494 with British Patent No. 538,016 (Defendants' Exhibit 10) would be matters of "straightforward engineering design," two technological graduates (one in Physics, the other in Physics and Engineering) testified on behalf of plaintiff as to the technical difficulties that would be encountered in making such combinations, and the unsatisfactory results that would be obtained even if the proposed combinations were made. Plaintiff's witness Van Der Linden, an independent expert witness employed by Rabinow Electronics, is an engineer with practical experience in the design and construction of many optical reading devices. It is indeed strange that defendants, who bear the statutory burden under 35 U.S.C. § 282 of proving the claims

of the Wolowitz patent in suit to be invalid, did not choose to present a single qualified engineer, independent or otherwise, to testify in their behalf at the trial with regard to the mechanical aspects of this case. The mechanisms involved are just not that simple. For example, the intricate mechanisms shown in Figures 1 to 3 of Fuller, U. S. Patent No. 2,110,854 (Defendants' Exhibit 13) are virtually incomprehensible without the benefit of expert testimony from a qualified engineer. Since defendants Addressograph, Gulf and Humble were apparently unable to find a single qualified engineer, employee or otherwise, to testify in their behalf at the trial, defendants should not be surprised to learn that the Court finds that the weight of the evidence presented on the technological questions in this case favors the position of plaintiff Wolowitz that his patent in suit is valid and infringed by the accused Addressograph machine.

Defendants have contended that if all the evidence presented to this Court had been before the Patent Office Examiner, the Wolowitz patent in suit would never have been granted by the Office. The obvious answer to such an argument in this jurisdiction is that Wolowitz could always have filed a civil action in this Court to obtain a patent under 35 U.S.C. § 145, in which event the Commissioner might well have been authorized to issue such patent. In that situation, however, the normal presumption of administrative correctness accorded to the Patent Office decision to deny the patent would have required Wolowitz to prove, by clear and convincing evidence carrying thorough conviction, that the Patent Office decision was either clearly erroneous on its face or lacked a rational basis. In the present case, however, the normal presumption of administrative correctness accorded to the Patent Office decision to grant the patent in suit requires defendants to prove, by clear and convincing evidence carrying thorough conviction, that the Office erred in granting the patent, especially since said normal presumption of administra-

tive correctness is strengthened by the statutory presumption of validity accorded to the patent in suit in unequivocal terms by the first sentence of 35 U.S.C. § 282. Defendants have fallen far short of sustaining their statutory burden of establishing invalidity under 35 U.S.C. § 282 in this case. The requisite clear and convincing evidence of invalidity of the Wolowitz patent has not been provided by the defendants in this case.[1]

■■ Turning now to the issue of infringement of the patent in suit, the Court holds that plaintiff has sustained his burdens of proving both his ownership and infringement of his patent by the accused Addressograph data recorder. While the claims do not read on any combination of elements fairly taught or clearly suggested by the prior art of record, Claims 1 to 7 read squarely on the accused machine. Defendants' major contention is that the elements in plaintiff's functionally worded claims should be strictly limited to include only the structures which are specifically shown in the drawings of the patent in suit and exactly described in the patent specification. Defendants' contention is contrary to the following express language of the third paragraph of 35 U.S.C. § 112:

"An element in a claim for a combination may be expressed as a means or step for performing a specified function *without the recital of structure,* material, or acts in support thereof, and *such claim shall be construed to cover* the corresponding structure, material, or acts described in the specification *and equivalents* thereof." (Emphasis added).

This paragraph was added to the patent statutes by Congress for the first time in 1952. A good indication of the underlying legislative intent is provided by Federico, "Commentary on the New Patent Act," 35 U.S.C.A. §§ 1–110, p. 25 (1954), as follows:

"It is unquestionable that some measure of greater liberality in the use of functional expressions in combination claims is authorized than had been permitted by some court decisions, * * *."

The close relationship of the new third paragraph of 35 U.S.C. § 112 to the issue of patent infringement is indicated by Federico on p. 26, speaking of the expression "equivalents thereof," as follows:

"This relates primarily to the construction of such claims for the purpose of determining when the claim is infringed (note the use of the word "cover"), and would not appear to have much, if any, applicability in determining the patentability of such claims over the prior art, * * *."

The Court has construed the functional claims of the Wolowitz patent in suit "to cover * * * equivalents thereof." As construed, Claims 1 to 7 read word for word on the accused Addressograph machines represented by plaintiff's Exhibit 3, the Model 12–55 Data Recorder. Defendants have principally based their defense of noninfringement on the allegation that the Wolowitz patent is limited to printing the standard IBM tabular code (or Hollerith code), while the accused machines print the Addressograph plural bit code. However, defend-

---

1. It is fully recognized that this Court recently held that only a mere preponderance of the evidence was the degree of proof required of the alleged infringer in order to meet its statutory burden of establishing invalidity of the patent in suit. Abington Textile Machinery Works v. Carding Specialists (Canada) Ltd., 249 F.Supp. 823, 848 (D.C.D.C.1965). In that case, however, the statutory presumption of validity had been considerably weakened by the fact that the Varga patent in suit previously had been held invalid *in personam* in a suit involving a third party. In such circumstances, the Court was, and is, of the opinion that only a mere preponderance of the evidence should be required of the alleged infringer. It is worthy of mention that plaintiff Abington, which failed to meet even that minimal degree of proof, has since withdrawn its appeal to the Court of Appeals.

ants do not thereby avoid the use of the IBM code. To the contrary, tabulating cards printed with the Addressograph code are subsequently passed under scanning heads on specially designed optical reading machines which sense the Addressograph code marks by a photoelectric cell principle, then punch the coded information in the tabulating cards according to the standard IBM code, after translating the sensed data from one code to the other. The Court regards this as no more than a rather ingenious, but unsuccessful, attempt to design around the Wolowitz patent in suit.

■■■ Even if the specification or file history of the patent specifically mentioned the IBM code, which they do not, the standard IBM tabular code and the Addressograph plural bit code would still be regarded as equivalent "location sensing codes," to use the terminology employed by both plaintiff's witness Montague in his affidavit of record and defendant Addressograph's Vice President Margach (Plaintiff's Exhibits 19 and 29). One final point might also be mentioned, since defendants have stressed the fact that Addressograph uses a "plural bit code" with two bits or marks per column representing a numeral, in alleged contrast to the single bit IBM code. While it is true that the standard IBM tabular code is a single bit code as far as the Arabic numerals are concerned, it is a well-known fact, of which defendant Addressograph is presumably aware, that the standard IBM code is likewise a "plural bit code" insofar as the alphabet is concerned. Each of the 26 letters is represented in standard IBM code by two bits or marks per column, i. e., a zone punch (12, 11, or 0) combined with a numeric punch (1 to 9). Although this last factor is in no way essential to the decision in this case, the Court feels entitled to take judicial notice of this one fact which is not of record, since IBM tabulating cards are so common in this country today.

Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court makes the following additional Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT
### I. Nature of the Action and the Parties

1. This is an action under the patent laws of the United States for infringement of U. S. Patent No. 2,582,187, granted January 8, 1952 to William H. Wolowitz, for "Printing Machine for Duplicating Indicia." The patent issued on an application filed August 5, 1949 which, in turn, was a continuation-in-part of an earlier application filed May 19, 1949.

2. By order of the Court dated April 28, 1965, this case, Civil Action No. 1460-63, was consolidated for trial with the case of Wolowitz v. Humble Oil & Refining Company, Civil Action No. 115-64.

3. Plaintiff, William H. Wolowitz, is a citizen of the United States and a resident of Washington, District of Columbia.

4. The defendant, Addressograph-Multigraph Corporation (hereinafter referred to as "Addressograph") is a Delaware corporation having an office and place of business in Washington, District of Columbia, and manufactures and sells printing machines, called data recorders, which are charged by the plaintiff to infringe the Wolowitz patent.

5. The defendants, Gulf Oil Corporation and Humble Oil and Refining Company, both have places of business in Washington, District of Columbia, and both have acquired the accused printing machines from Addressograph for use at service stations where their petroleum products are sold. The defendant, Ralph Cobb, operates a Gulf service station in the District of Columbia where one of accused data recorders has been in use.

6. Defendants Gulf and Cobb have used customer's credit cards as exemplified in plaintiff's Exhibit 4 in the accused Addressograph Model 12–55 data recorder, and defendants Addressograph and Gulf have supplied such data record-

ers and credit cards to others together with instructions how to use the credit cards in the Model 12–55 machines.

7.   Defendant Humble Oil & Refining Company has used the accused Addressograph Model 12–55 data recorder together with customers' credit cards as exemplified by plaintiff's Exhibit 5, and it has supplied such data recorders and credit cards to others and thus induced such others to use the credit cards in the Model 12–55 machines.

8.   Plaintiff Wolowitz charges that the Addressograph data recorder, Model No. 12–55, infringes Claims 1 through 7 of the Wolowitz patent.

9.   The issues in this case are (1) whether the Wolowitz patent in suit is invalid for anticipation, obviousness, and indefiniteness of Claims, and (2) whether the Addressograph data recorder infringes the Wolowitz patent.

II.   The Addressograph Data Recorder

10.   The function of the Addressograph data recorder is to print, with the aid of the customer's credit card, a separate sales record for each retail credit sale.

11.   The Addressograph data recorder prints certain fixed information, i. e., the customer's name and account number from the customer's credit card and, at the same time, prints variable information, namely, the total amount of the sale, from printing wheels rotatable on a fixed axis with the printing elements being in the printing bed of the machine. Each wheel is set by the operator to print the appropriate digit both legibly and in code by the manipulation of a handle which imparts rotation to the printing wheel through a rack and pinion connection. The operator places the credit card face up in the machine, sets the wheels to print the total amount of the sale, places the combined sales invoice and tabulating card in the machine and makes an impression from both the credit card and the printing wheels.

12.   The credit cards used in the accused Addressograph data recorder print the customer's account number in numer-

als along one line and in code along an adjacent pattern. Similarly, the settable printing wheels print the total amount of sale in numerals along one line and in the same code along an adjacent pattern, each numeral and its counterpart code symbol being printed from the same printing face of the wheel.

13.   The code used by Addressograph is a plural bit code adopted by Addressograph to represent the numerals from 0 through 9. The code symbol for each digit comprises two short bars spaced vertically on the printing face within a relatively small space of 0.4 inch, and the numerical value of the digit is represented by a different location of the two bars within the space of 0.4 inch for each numeral. The compact spacing of the code makes practical the use of a single printing face for each numeral and its code counterpart, provides flexibility in positioning the code on the credit card and sales invoice and avoids cluttering of the credit card and sales invoice with code marks that might interfere with the space requirements for uncoded printed matter and handwriting on the sales invoice.

14.   The Addressograph plural bit code is not in itself compatible with conventional accounting machines, and the recorded data must subsequently be translated into the standard IBM tabular code for processing in such conventional accounting machines.

15.   The sales invoice used in the Addressograph data recorder is a manifold sales slip which the customer inspects and signs after the transaction is recorded thereon. One copy of the sales slip is retained by the customer, one copy is retained by the service station, and one copy in the size and thickness of a tabulating card is transmitted to a central office where it is processed in an optical code reader specially developed by Addressograph for reading its plural bit code and translating it into the standard IBM code. The numerical data on the tabulating card represented in the Addressograph plural bit code is converted by the optical code reader into punched

holes across the width of the tabulating card in the standard IBM code. The optical code reader is not charged to infringe the Wolowitz patent.

16. A complete tabulating card containing the required accounting data in standard IBM code is thereby produced in a sequence of steps at the service station and at the central office. The punched hole tabulating cards produced by the optical code reader may be processed in standard sorting and tabulating machines for well-known accounting purposes.

17. The structure and operation of the accused Addressograph data recorder are described in the Maul U. S. Patent No. 3,138,091 owned by Addressograph.

### III. The Disclosure of the Wolowitz Patent in Suit

18. The Wolowitz patent describes a printing machine for:

> "recording a business transaction directly onto a tabulating or statistical card for use in connection with card sorting and tabulating machines".

The Wolowitz patent repeatedly specifies that such transaction is to be recorded on the tabulating card in the form of "sensing marks". The term "sensing marks" is defined in the Wolowitz patent as follows:

> "It will be understood, further, that the term sensing marks refers to any suitable electrically conductive marks provided on a tabulating card or the like for use in electrical analyzing machines well known in the art." (Wolowitz patent, col. 4, lines 55–59).

The meaning of such definition is that the electrically conductive sensing marks are spaced across the tabulating card in accordance with a location sensing code having predetermined values, so that such sensing marks may be sensed by a reading machine and subsequently converted into punched holes in the standard IBM tabular code.

19. The standard IBM tabular code has been used throughout the country for more than thirty years as the location sensing code that is processed in conventional tabulating machines. For use in accounting, the standard IBM code always appears on tabulating card having a width of exactly $3\frac{1}{4}$ inches and such dimension is an integral part of the code. Each of the numerals 0 through 9 is represented by a single sensing mark or punched hole spaced progressively in the order of the numerals at fixed levels across the tabulating card beginning at the level for 0, which is five-eighths of an inch below the top edge of the tabulating card. The ten levels for the ten numerals are spaced progressively at intervals of one-quarter inch down the tabulating card and the total distance spanned by the ten levels is 2.375 inches. The aforesaid dimensions and spacing of the standard IBM code are fixed and rigid and are the same today as they were when the Wolowitz patent application was filed in 1949 and long before.

20. The Wolowitz patent in suit describes particular mechanisms for recording fixed numerical data from a portable printing plate (e. g., a customer's credit card) in the form of "sensing marks" and for simultaneously recording, also in the form of "sensing marks", variable information that has been set up in the machine. Plaintiff Wolowitz testified at the trial that the printing mechanisms specifically disclosed in the Wolowitz patent were intended, among other things, to produce sensing marks on the tabulating card in accordance with the fixed spacing and dimensions of the standard IBM code, so that such marks could be read by an IBM mark sense reproducer. Plaintiff's witness Montague testified at the trial that the mechanisms specifically disclosed in the Wolowitz patent were well adapted to place sensing marks across the tabulating card, with one mark for each digit and in progressive order from 0 through 9, in accordance with the pattern of the standard IBM code.

21. The Wolowitz patent specifically describes five forms of structure (illustrated in Figures 2, 6, 8, 9 and 11) for printing "sensing marks." All five forms of the printing machine shown include,

for each digit of the variable information to be represented by a sensing mark, an assembly which is transversely movable across the printing bed of the machine to set up a printing element across the printing bed in one out of ten positions representing in progressive order the numerals 0 through 9, thereby to print a "sensing mark" at the particular transverse position that represents the selected numeral according to the location sensing code chosen.

22. None of the mechanisms specifically disclosed in the Wolowitz patent for printing "sensing marks" is capable without modification of printing the Addressograph plural bit code. In the Addressograph code, there are two marks for each digit; the marks are not necessarily spaced in progressive order corresponding to the digits; each of such marks may be in one out of five positions, not ten positions as for numeric IBM code sensing marks; and such five positions for the Addressograph code are confined to a transverse space of 0.4 inch in comparison with the transverse space of 2.375 inches for ten positions that is standard for the sensing marks of the IBM code.

23. The Wolowitz transversely movable printing elements are designed, among other things, to print "sensing marks" in accordance with the specific requirements of the IBM mark sensing system. The accused Addressograph data recorder is incapable, without modification, of printing "sensing marks" in accordance with the IBM mark sensing system, and the Addressograph data recorder employs a relatively compact code that is printed by the raised printing indicia on the periphery of conventional printing wheels rotating on a fixed shaft and not transversely movable across the printing bed. There are, however, transversely moving raised printing indicia in the Addressograph data recorder. The printing indicia move transversely across the bed, as well as up and down, as the wheels rotate.

24. Three of the forms of mechanism described in the Wolowitz patent (namely, those shown in Figures 2, 6 and 8) include a series of digit printing wheels, one for each variable data code printing assembly, which rotate on a fixed-axis shaft, just as the Addressograph printing wheels do, to print in a straight line the numerals that correspond to the code "sensing mark" whose imprint is made by the separate raised printing indicia placed in position simultaneously. The fixed-axis digit printing wheels are stated in the Wolowitz patent (col. 8, lines 49–50) to be optional or auxiliary features of the mechanisms specifically described in the Wolowitz patent, and the Wolowitz patent shows in Figures 9 and 11 that similar coaxially mounted printing wheels might be employed for printing the code marks of a location sensing code. The Wolowitz patent thereby emphasized that the transversely moving printing units, such as printing wheels illustrated in Figures 2, 9 and 11 as carrying raised printing indicia that move transversely across the printing bed were one of the characteristic and distinguishing features of the Wolowitz imprinters.

25. There has been no authorized (e. g. licensed) commercial use in this country of any printing machine for printing "sensing marks" upon a tabulating card, as specifically disclosed in the Wolowitz patent.

26. Defendant Addressograph considered and rejected the approach of building a data recorder that would punch the standard IBM code directly in a tabulating card at the point of sale. Defendant Addressograph concluded that such a machine would be impractical from the standpoint of reliability in operation, and that the cost and required complexity of the mechanism would be too great for a machine that would be placed at thousands of service stations, exactly as would be the case for the machine disclosed in Fuller et al., U. S. Patent No. 2,110,854, issued March 15, 1938.

27. In 1959, defendant Gulf Oil Corporation formulated its requirements for its imprinter and optical reader independently of defendant Addressograph and before approaching Addressograph

for the supply of such equipment. The requirements of Gulf Oil Corporation precluded a service station imprinter which would place IBM sensing marks on, or punched holes directly in, the sales invoice. The requirements of Gulf Oil Corporation did specify that standard IBM code punched holes for both fixed and variable information would be placed upon its invoices by an optical reader operating at its central accounting offices.

## IV. The Claims of the Wolowitz Patent

28. Claim 1 of the Wolowitz patent in suit, the language of which is included in all of the other claims of the patent, reads:

"Apparatus comprising a bed area having a first portion, a substantially flat plate removably positioned in said first portion, said plate having printing indicia formed on its upper surface and arranged on said surface along a pattern conforming to a code having predetermined values, said bed area having a second portion adjacent said first portion, said second portion having selective indicia positioned therein settable to values corresponding to the pattern of the indicia on individual plates positioned in said first portion of the bed for any printing operation of the apparatus, means for selecting indicia in said second portion and setting the same along the pattern conforming to said predetermined values, and unitary impression means coacting with said plate and said selective indicia for simultaneously forming an impression on a sheet placed over said first and second portions in each operating cycle, whereby the sheet will have reproduced thereon characters from indicia at said first and second portions conforming to said predetermined values."

29. Claim 1 is clear, unambiguous, and definite as a matter of English language. If the exact metes and bounds of the Wolowitz patent claims are to be ascertained, resort may be had to the spec-

ification of the patent and the file history of the prosecution to determine the essential meaning of the terms used in defining the elements of the claimed combinations, so that the range of equivalents of the specifically described elements may be determined as required by the third paragraph of 35 U.S.C. § 112.

30. Claim 1 calls for printing in the same location sensing code in two printing beds but does not limit the code to any particular one, such as the standard IBM code or a plural bit code. All printed location sensing codes have a "pattern" and have "predetermined values" and are therefore equivalent, although the Wolowitz specification discloses only single bit location sensing codes, for example, the standard IBM code wherein sensing marks representing numbers that are spaced in the IBM code are readable by an IBM mark sense reproducer. The Wolowitz specification does not preclude the use of other equivalent location sensing codes, nor does the file history of the prosecution of the application which matured into the patent in suit.

31. Claim 1 refers to "selective indicia" in the second bed area that are "settable to values corresponding to the pattern of the indicia" in the first bed area and to means for selecting and setting the selective printing indicia "along the pattern" corresponding to the "said predetermined values" in the first bed area containing the flat plate. This is quite definite. The phrase "selective indicia" refers to the selective printing indicia in the second portion of the bed area. As shown in the patent drawings, and as testified by plaintiff's witness Montague, the "selective indicia" set "to predetermined values" and "along the pattern" refer to the transversely moving printing indicia that are disclosed in the patent as moving transversely across the printing bed.

32. Claim 1 says that "characters" are to be printed by the raised printing "indicia". The word "characters" is definite. The Wolowitz specification repeatedly denominates that which is print-

ed by the Wolowitz transversely moving printing indicia as "sensing marks"; and the specification defines the term "sensing marks" in accordance with its recognized meaning in the art and employs the term repeatedly as being marks spaced transversely on a tabulating card in accordance with either the standard IBM tabular code or an equivalent location sensing code such as the Addressograph plural bit code.

33. The definition of "sensing marks" was included in the Wolowitz specification in response to an objection made by the Patent Office. The Patent Office Examiner objected that the "description and claims" were indefinite unless it were "revealed what the sensing marks are or what they are for." The applicant added to the specification the definition set forth in Finding 18 and stated that the ground for objection was thereby removed. Wolowitz thereby made of record in the Patent Office that, in interpreting the allowed Wolowitz claims, the "characters" that were to be printed "along the pattern conforming to said predetermined values" were "sensing marks" as defined in the Wolowitz specification.

34. The requirements in Claim 1 of the Wolowitz patent for

a) printing indicia transversely movable across the printing bed ("selective indicia" set "to predetermined values" and "along the pattern"), and

b) the printing of "sensing marks" ("characters conforming to said predetermined values") are fully met by the accused Addressograph data recorder.

The Addressograph data recorder has selected printing indicia transversely movable across the printing bed (Finding 23) and prints "sensing marks" as defined in the Wolowitz patent specification.

35. Claim 2 is the same as Claim 1 except that it contains this additional limitation:

"a further set of selective indicia in said second portion settable simultaneously by said selecting means for said first mentioned set of selective indicia in said second portion."

The additional language in Claim 2, when interpreted in light of the patent specification, is definite concerning the function for the "further set of selective indicia" and, as permitted by the third paragraph of 35 U.S.C. § 112, sets forth no requirement concerning structure. It cannot be ascertained from the language of Claim 2 whether coded or uncoded "characters" are to be printed by said "further set of selective indicia". However, when interpreted in light of the specification, it is clear that such additional language in Claim 2 is a reference to the "auxiliary" and "optional" printing wheels 80 for printing legible Arabic numbers, illustrated in Figures 2, 6 and 8 of the Wolowitz patent, and which are admittedly old in the art as individual mechanical elements.

36. Claim 3 is the same as Claim 1 except that it contains the language that the means for "selecting indicia" shall include "individual levers associated with said selective indicia." This added language refers only to an admittedly old individual structural feature in printing machines, viz., slides, keys and other finger control assemblies for setting printing elements.

37. Claim 4 is the same as Claim 2 except that it adds the same language concerning "individual levers" that appears in Claim 3 relating to an individually old structural feature in printing machines.

38. Claim 5 is the same as Claim 1 except that it calls for "a series of wheels carrying selective indicia." This recital of structure apparently excludes the structures specifically shown in Figures 6 and 8 of the Wolowitz patent since in such structures the "selective indicia" for the location sensing code are not carried on wheels. In any event, the presence of printing indicia on wheels is an old individual structural feature in printing machines and imparted no novelty in itself to the subject matter of Claim 5.

39. Claim 6, emphasized by plaintiff at the trial, is the same as Claim 2 except that it contains the same limitation concerning wheels as appears in Claim 5.

40. Claim 7 is the same as Claim 2 except that it specifies that the "further set of selective indicia" are carried on wheels, e. g. the "optional" rotary printing wheels 80. This is an old individual structural feature in printing machines and imparted no novelty in itself to the subject matter of Claim 7.

41. Claim 8, not charged to be infringed, differs from Claim 2 only in that it specifies that each of the two sets of "selective indicia" is mounted on separate wheels.

42. The accused Addressograph data recorder fully meets the requirements of each of Claims 1 to 7 of the Wolowitz patent, each of which includes all of the requirements of Claim.1.

43. Claims 1 to 7, inclusive, of the patent in suit read squarely on the accused Addressograph Model 12–55 data recorder when used with the Gulf customers' credit cards exemplified by plaintiff's Exhibit 4.

44. Claims 1 to 7, inclusive, of the patent in suit read squarely on the accused Addressograph Model 12–55 data recorder when used with the Humble (Esso) customers' credit cards exemplified by plaintiff's Exhibit 5.

45. For each element of each of Claims 1 to 7 of the patent in suit, defendants have an equivalent element in their machine. Moreover, the combinations of elements defined in said claims and used by defendants are the equivalent of each other.

46. Defendants Gulf, Cobb, and Humble obtained the accused Model 12–55 machines from defendant Addressograph which was aware of plaintiff's patented invention at the time said machines were designed by Addressograph.

47. The Gulf credit card, plaintiff's Exhibit 4, is a material part of the patented combination and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

48. The Humble (Esso) credit card, plaintiff's Exhibit 5, is a material part of the patented combination and is not a staple article or commodity· of commerce suitable for substantial noninfringing use.

## V. Prior Art
### The Vogt Patent No. 2,606,494

49. The Vogt patent No. 2,606,494, filed January 29, 1948, issued August 12, 1952, discloses a machine which is somewhat similar to the Addressograph data recorder, in that both print data on a sales invoice in a single impression from a credit card and from rotary date printing wheels set up in the machine.

50. The Vogt machine prints information from a token and credit card 11 and 12 in one bed of the machine and from date printing wheels 26 rotating on a fixed shaft in an adjacent bed of the machine. The date wheels are set by hand-manipulated friction wheels 32. An impression is made on a tabulating card or sales invoice by moving the roller 37 over the sales invoice.

### British Patent No. 538,016

51. The particular feature embodied in the Addressograph data recorder of having each of the printing elements on fixed-shaft printing wheels arranged to print a legible Arabic numeral and to print its location sensing coded counterpart by the same printing element was also well known long before Wolowitz filed his patent application. British patent No. 538,016, accepted July 17, 1941, shows such dual purpose printing elements on fixed-shaft printing wheels for use in business machines.

### Summary of Vogt '494 and British 538,016 Patents

52. When the claims of the Wolowitz patent are construed, as urged by plaintiff, to read on the accused Addressograph data recorder with its rotary code printing wheels with printing indicia transversely movable across the printing bed, then the claims of the Wolowitz patent as thus construed according to the third paragraph of 35 U.S.C. § 112 would

not apply equally to the printing machine disclosed in the Vogt patent when the printing indicia on the plates 11 or 12 and on the settable date printing wheels 26 of the Vogt machine were arranged to print data in a location sensing code along a code pattern. It was old in the art that printing machines for the preparation of business records might print code if desired. The specific disclosure in British patent No. 538,016 of typewheels for printing information both in coded form and in legible form for automatic data processing confirmed that, long before Wolowitz and Vogt, it was well known, and according to defendants only a matter of choice to use closed bed printing machines with rotary printing wheels like the prior art Vogt machine to print information in code. However, Vogt apparently did not choose to do so when he filed his application in 1948, seven years after the British patent date.

53. Defendants propose to combine Vogt U. S. patent No. 2,606,494 with British patent 538,016. If the combination were made, the resultant closed bed combination would be impractical as it would result in undesirable printing errors during ordinary conditions of use. Moreover, the arrangement would fail to meet the terms of the claims in suit since it would still lack a single location sensing code having a pattern as defined in the Wolowitz claims. The arrangement would lack "selective indicia" settable to values "corresponding to the" (i. e. along the same) pattern of the same location sensing code on the credit card, as shown by plaintiff's Exhibit 27 and Figures 1, 4, and 5 of the Vogt patent. The position of the uncoded rotary date wheels of the accused Addressograph machine (plaintiff's Exhibit 3) also shows this result of lack of correspondence "to the pattern."

#### The Ekblom Patent No. 2,530,049 and Addressograph's 1935 Data Recorder

54. The Ekblom patent No. 2,530,049, filed February 21, 1944, issued November 14, 1950 shows mechanism for imprinting by a single pass of a platen roll 22 (Fig. 2) from a customer's identification plate (56) and settable digit typewheels 76. No code is indicated in the Ekblom patent drawings (Figures 10 and 11) or specification.

55. In 1935, about fourteen years before the Wolowitz patent was applied for in 1949, Addressograph had on sale a machine adapted to make simultaneous impressions on a document from an embossed printing plate placed in one bed area and from lever settable "variable date wheels" in another bed area of the machine. The machine is shown pictorially and described in Addressograph's brochure (copyright 1935) entitled "How Life Insurance Companies Use the Addressograph." The accused Model 12–55 machine also utilizes "variable date wheels" with uncoded numerals.

#### Fuller Patent No. 2,110,854

56. According to the record in this case, Wolowitz was the first to disclose a simple, low-cost machine for use at retail outlets to record both fixed and variable information on a tabulating card in a coded form ready for automatic data processing machines. The expired Fuller U. S. patent No. 2,110,854, filed December 4, 1935, issued March 15, 1938, and assigned to IBM, describes a very complex machine to be used in department stores for producing a tabulating card with the customer's account number and original sales data set up in the standard IBM code as punched holes and ready for use in a conventional tabulating machine. The Fuller machine punches the data in the IBM code in a tabulating card and prints the data in Arabic numerals on a sales invoice (see Figs. 12 and 13). However, the cost of installing and maintaining the Fuller machine in every Gulf or Humble service station would be prohibitive, in view of the complexity of the machine as shown in Figures 1 to 3 of the Fuller patent.

#### Hoffman Patent No. 1,919,219

57. Wolowitz was not the first to disclose a data recorder for preparing a tabulating card ready for immediate use in conventional tabulating machines by

recording on the card in a single impression (1) fixed information in both legible form and in the standard IBM code from a removable plate inserted in one bed of the machine and (2) variable information set in both legible form and in the IBM code in another adjacent bed of the machine. A somewhat similar machine was disclosed earlier in the expired Hoffman U. S. patent No. 1,919,219, filed August 22, 1931, issued July 25, 1933.

58. The Hoffman '219 patent shows mechanism for preparing an IBM tabulating card from fixed information on a removable plate 33 in one closed bed and from variable punch bars 34 in another closed bed. The fixed and variable information is to be recorded on the underlying card both in legible form along a straight line and in IBM code (Figs. 3 and 15). The punched hole tabulating card thereby produced is to be "at once ready for the tabulating machine."

59. The expired Hoffman '219 patent is somewhat similar to the open bed printing machine described in the Wolowitz patent in that (1) both record information either in or on a tabulating card in a location sensing code at a point of data origin, (2) both record information either in or on the tabulating card from a removable plate and from variable data that is set up manually or mechanically in the machine, (3) both have adjacent closed or open beds for the removable plate and settable data and a unitary impression means is employed for making a punched or printed impression from both beds, and (4) both record information in or on the tabulating card in both Arabic numerals and in a location sensing code.

### British Patent No. 3303 of 1921

60. The Hoffman '219 patent (Fig. 3) discloses that the variable information would be set up manually by selecting and placing by hand in the machine appropriate punch bars 34 for each transaction, each of which would have its legible character at one end of the bar 34 and the corresponding IBM code punch at the appropriate position on such bar. The expired Hoffman '219 patent did not specifically disclose, as does Wolowitz, mechanical assemblies for setting punches or printing indicia at selected positions across the printing bed.

61. Auxiliary mechanism available for use in the Hoffman machine for mechanically setting printing or punching elements in a location sensing code and for simultaneously setting fixed-axis printing wheels was earlier disclosed in British patent No. 3303 filed in 1914 and accepted June 2, 1921, ten years prior to Hoffman's 1931 application filing date. Expired British patent No. 3303 discloses mechanism for accomplishing that which is intended to be accomplished by the mechanical assemblies and the "optional" digit printing wheels 80 disclosed in the Wolowitz patent, and the structure shown in the British patent is mechanically equivalent to the structure specifically shown in Figure 8 of the Wolowitz patent.

62. The expired British patent No. 3303 shows the following in Fig. 13 thereof (see also page 3, line 113, to page 4, line 26):

(a) an operating rod p for moving a code marking element r (in this case a perforating punch) back and forth across a code grid area (illustrated in Fig. 3);

(b) a printing segment n for printing a legible Arabic numeral corresponding to the punched code;

(c) means, including the rack and pinion q, for mechanically setting the printing segment n to the correct position to print a legible numeral corresponding to the set positioning of the code punch r;

(d) a group of the assemblies p, r, n, q arranged side-by-side to provide for individually setting up both the punched hole code and the legible indication thereof for all of the digits of a variable number to be recorded.

### Summary of Hoffman '219 and British 3303 Patents

63. Defendants propose to combine Hoffman U. S. patent No. 1,919,219 with British patent No. 3303 to invalidate the claims in suit. If the patents were combined, however, the resultant closed bed combination would not be a practical machine since the keyboard arrangement of the British patent would be attached to vertically movable parts of the Hoffman patent which go up and down with each punching operation, and moreover, the mechanism of the British patent would be inverted or upside down and in an impractical, if not inoperable position. In addition, the proposed combination of Hoffman and the British patent lacks material elements of the claims in suit, such as the "substantially flat plate removably positioned" in a first portion of the bed area and the "printing indicia" on the "upper surface" of the flat plate

64. Expired British patent No. 3303, available for use with Hoffman, disclosed a particular form of structure later proposed in Figure 8 of Wolowitz for mechanically setting his printing indicia in printing position. Although defendants contend that any differences between the Wolowitz patent and the combination of the Hoffman '219 patent with the British 3303 patent were only matters of choice and were obvious to persons skilled in the art, it was apparently not "obvious" to Hoffman to make that "choice" in 1931, ten years after the British patent date.

### The Mechanical Elements of the Addressograph Data Recorder Were Known Before Wolowitz

65. The individual mechanical elements that were adopted by Addressograph for the accused Addressograph data recorders were all known to Addressograph and others long before the filing date of the Wolowitz patent.

66. The accused Addressograph data recorder is somewhat similar to the prior art Vogt '494 patent and Addressograph's 1935 data recorder in that 1) all have either open or closed beds for receiving embossed printing plates, 2) all have settable rotary date wheels in an adjacent table rotary date wheels in an adjacent bed, 3) all have means for setting the date wheels to print selected dates, and 4) all have a movable platen roller for making a simultaneous impression from both beds of the machine in a single operation.

67. The expired Hoffman patent No. 1,871,059, filed November 21, 1930, issued August 9, 1932, shows mechanism (Figs. 1 and 4) for simultaneously printing by a common platen 72 from settable digit type wheels 49 and from a changeable printing member or plate 28 bearing an accumulation of prearranged uncoded information and being interchangeable substantially in the manner of tokens or credit cards.

68. The accused Addressograph data recorder includes mechanism for setting the code printing wheels by rack and pinion connections between each wheel and an associated finger control key on the operating panel of the machine. Such rack and pinion mechanisms were well known long before the filing date of the application for the Wolowitz patent, as shown in the expired Hoffman '059 patent and the Ward U. S. patent No. 2,070,763, filed October 30, 1934, issued February 16, 1937.

69. It had also been suggested long before Wolowitz that an embossed plate or token might be adapted to imprint both legible information and corresponding coded information for automatic machine use. Such a disclosure is contained in Young patent No. 2,020,-925, filed June 2, 1933, issued November 12, 1935, for a "Card Sorting Machine."

70. The accused Addressograph data recorder, with its code and date printing wheels rotatable on two fixed shafts, its finger control keys for mechanically setting the code printing wheels, its specially adapted printing plate and embossed credit card, and its roller platen for taking a simultaneous impression from the settable code and date printing wheels and embossed credit card, embodies a structural combination the individual elements of which are each fully shown in the prior art, including Addressograph's own commercial practice since as early as 1935. The Addressograph data re-

corder does not embody any individual structural feature or element of the claimed combination that was first disclosed in the Wolowitz patent. Each of the individual elements of the combination claimed by Wolowitz was old and known to the art.

71. None of the patents relied on by defendants was cited by the Patent Office during the prosecution of the application on which the Wolowitz patent was granted. Two other (later) Hoffman patents and five other U. S. patents were cited. The references cited by the Patent Office likewise do not (1) show a simple, low cost printing machine for producing at the point of data origin a location sensing code printed tabulating card ready for use in tabulating machines and impressed with fixed information in code taken from a token or plate and variable information from settable elements in the machine in both Arabic numbers and in the same code along the same pattern, as disclosed in the Wolowitz patent in suit; or (2) show transversely moving printing or punching elements for producing code marks as disclosed in the British patent No. 3303; or (3) show rotary code printing wheels for printing both legible numbers and code counterparts, as disclosed in British patent No. 538,016; or (4) show a printing machine for printing both fixed information from a portable plate or credit card and settable variable information in a single impression on a sheet, as disclosed for information in uncoded, legible form in the Vogt, Ekblom and Hoffman '059 patents and as embodied in Addressograph's 1935 data recorder with variable date wheels.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter. 28 U.S.C. §§ 1331 and 1338.

2. The Wolowitz patent claims are not anticipated under 35 U.S.C. § 102 because the structure and operation of the claimed "invention is not identically disclosed or described" in all material respects by any single prior art reference, as contemplated by Section 102 of Title 35, U.S.Code. See 35 U.S.C. § 103.

3. The Wolowitz patent is valid because the claimed combination of individually old mechanical elements "as a whole" would not have been obvious at the time Wolowitz made his invention to a person having ordinary skill in the art of business data recording machines. 35 U.S.C. § 103.

4. The claims of the Wolowitz patent are not invalid for indefiniteness. Said claims particularly point out and distinctly claim the subject matter which patentee Wolowitz regards as his invention, as required by statute. 35 U.S.C. § 112, second paragraph.

5. The accused Addressograph data recorder infringes Claims 1 to 7 of the Wolowitz patent. The Wolowitz patent and its claims, when construed in the context of the specification and the file history, are limited to a printing machine having transversely movable raised printing indicia to be located at predetermined transverse positions across the printing bed of the printing machine and to print sensing marks on a tabulating card in a location sensing code. The Addressograph data recorder has such transversely movable raised printing indicia and prints sensing marks in an equivalent location sensing code. 35 U.S.C. § 112, third paragraph.

6. Plaintiff Wolowitz is the owner of the valid patent in suit and is entitled to recover for all past infringement thereof. 35 U.S.C. § 281.

7. Defendants have infringed, actively induced infringement of, and contributed to the infringement of Claims 1 to 7, inclusive, of the valid patent in suit. Plaintiff is therefore entitled to an award of damages as provided for in the Patent Act of 1952, as well as an injunction restraining further infringement. 35 U.S.C. §§ 271(a), (b), (c), 283, 284.