**MATHERSON–SELIG CO., an Illinois corporation, Plaintiff,**

v.

**CARL GORR COLOR CARD, INC., an Illinois corporation, Defendant.**

**No. 64 C 1394.**

United States District Court
N. D. Illinois, E. D.
June 29, 1967.

**338**

Irwin C. Alter, Chicago, Ill., for plaintiff.

Thomas F. McWilliams, John M. Mann, Mann, Brown & McWilliams, Chicago, Ill., for defendant.

WILL, District Judge.

### Decision on the Merits

This is a patent suit brought by Matherson-Selig Co., an Illinois corporation, against Carl Gorr Color Card, Inc., an Illinois corporation, for infringement of United States Letters Patent 2,797,010, issued June 25, 1957. Plaintiff is the assignee and legal owner of said patent and seeks a declaration of the validity of the patent along with injunctive relief and damages.

Jurisdiction is acquired under Title 28 U.S.C. § 1338. In lieu of oral testimony, certain depositions and exhibits filed by both parties have been received into evidence and will constitute the factual record in the case; in addition, the parties have submitted extensive trial briefs.

Defendant raises the defenses of invalidity and noninfringement. It contends that the patent is invalid because there was a prior public use within the meaning of Title 35 U.S.C. § 102 and because the subject matter of the patent was obvious at the time the invention was made within the meaning of Title 35 U.S.C. § 103. It further contends that even if the patent is valid, there has been no infringement because its process differs substantially from plaintiff's process and because plaintiff's claim is limited by application of the doctrine of file wrapper estoppel so that its patent does not read upon plaintiff's patent.

The parties have stipulated that the graphic chart, identified as defendant's Exhibit F, is a comparison of the steps of the patented process with that of the alleged infringing process. They have also stipulated that defendant received actual notice from plaintiff regarding alleged infringement of the patent on May 12, 1964, and that defendant manufactured three million fabric sample charts. Further, it is undisputed and the evidence so shows that these three million sample charts were manufactured in accordance with the alleged infringing process depicted in the graphic chart just referred to.

### Decision

The court, after careful consideration of the patent, the prior art, the file wrapper history, the depositions, and the trial briefs, holds that the patent is valid and has been infringed.

### The Patent

Essentially, plaintiff's patent covers a method of fabricating a sample chart, whereby air permeable fabrics are adhesively secured to air impermeable

backings, then cut into tabs and placed into hoppers, withdrawn from the hoppers by means of a vacuum, covered on their back sides with adhesive, and finally applied to a card. More specifically, and in the words of the single claim of the patent, the patent describes:

A method of fabricating a sample chart having a backing to which are adhesively secured a plurality of air permeable tabs of various physical characteristics, said method comprising applying air impermeable layers to the back sides of a plurality of segments of air permeable material having respectively, different physical characteristics, then cutting said segments into tabs and loading the tabs of respective segments into separate hoppers with the back sides of said tabs facing inwardly of the hoppers, contacting the outer sides of the tabs in said hoppers with parts of a suction head to lift one tab from each hopper, applying adhesive to the back sides of the tabs carried by the head and then clamping the back sides of the tabs carried by said head against the backing sheet to adhesively secure the last-mentioned tabs thereto.

*History of the Patented Process*

Prior to the invention of this process, hereinafter referred to as the Neer process, fabric sample charts were manufactured manually. The finished product could be turned out only at a slow rate, which resulted in an expensive item. The process was not only slow and expensive but difficult as well and even then, the sample chart was often unsightly. Large bolts of material had to be unrolled and cut into squares. The fabric, which was very often soft and flexible, was difficult to handle after it had been unrolled and was about to be cut. Also, the edges of the fabric had to be pinked in order to keep the fabric edges from unravelling. The pieces of fabric, or swatches as they are called, then had to be glued and placed by hand onto a chart. Unless this was precisely done by skilled swatchers, of which there was a shortage, the swatch was crooked or the glue became visible.

Because of the great demand for fabric sample charts, an improved process was necessary. Adolph Neer, president of Matherson-Selig Co. and inventor of the Neer process, experimented with many methods that proved unsuccessful. He tried using a vacuum to place the fabrics on the sample chart. This process had worked with success when paint chips were picked up and applied to sample cards, but fabrics presented a different problem because they were porous. As a result, the suction head was not able to maintain a firm contact with the swatch. In addition, the swatches were difficult to stack, one upon the other, because they tended to coalesce.

Neer approached the New Jersey Machine Corporation for help in solving this problem. The company, which manufactured the Pony Labelrite Machines that were used in applying paint chips to sample cards by suction, had no experience with fabric sampling and their only suggestion was to use more vacuum. However, this did not solve the problem because the vacuum head, although making a firmer contact with the swatch, tended to pick up more than one swatch at a time. Determining the proper amount of suction that should be used was further complicated by the existence of fabrics with different textures and thicknesses.

It was soon realized that the fabrics would have to be air-proofed. Coating the fabric with lacquers and glue-sizing were tried, but they either discolored or damaged the fabric or made it unworkable. Slipsheeting or alternating layers of fabric and material was also tried but the vacuum head tended to pick up both the fabric and the interleafed sheet and the latter then would become entangled in the glue rollers or fall off into the glue.

Finally, Neer adhered a nonporous, air impermeable paper backing to the

material. In addition to solving the suction problems (one swatch could now be picked up at a time), the fabric became easier to handle and could be placed simply and neatly in the hoppers from which it was removed by the suction head. Automatic cutters could be used and the edges of the fabric no longer had to be pinked because unravelling was no longer a problem. Also, fabrics of different textures and thicknesses could be used without any further complication.

## VALIDITY

*Prior Art*

■ The most pertinent prior art consists of a number of patents cited in the file of the Neer patent. As against these references, which are admitted by defendant to be the most pertinent,[1] the patent is presumed valid and the party asserting invalidity has the burden of establishing invalidity by clear and convincing evidence. Title 35 U.S.C. § 282; King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875 (7th Cir. 1966); Schnell v. Allbright-Nell Co., 348 F.2d 444 (7th Cir. 1965); Briggs v. M & J Diesel Locomotive Filter Corp., 342 F.2d 573 (7th Cir. 1965).

The Von Hofe patent was one of the three principal patents relied upon by the patent examiner throughout the prosecution of the Neer patent application. This patent, owned by the New Jersey Machine Corporation, relates to a labeling machine which takes a label by suction from a hopper, moves it onto a bottle and presses it thereon. It does not deal with air permeable materials but rather air impermeable materials such as paper labels; neither does it concern itself with materials of different physical characteristics. The patent does involve the use of suction, but it clearly does not anticipate or solve the problems that arise when it is desired to attach an air permeable material to a sample card.

The McKay patent, which is another of the three principal patents relied upon by the patent examiner, deals with a machine for forming sample cards by which small portions of air impermeable materials, such as color chips, are withdrawn from a plurality of hoppers and applied by means of suction to a sample card to which adhesive has already been applied. The patent does not deal with the problem of, or suggest the solution to, adhering air permeable materials to a sample card; neither does it deal with materials having different physical characteristics. Both this patent and the Von Hofe patent were mentioned by Neer in his patent application as earlier processes using suction to form sample charts which proved ineffective when used in conjunction with samples of fabric and other air permeable materials.

■ It may be pointed out that the machine disclosed in the McKay patent for applying paint chips to sample cards was manufactured by the New Jersey Machine Corporation and that the same basic machine, the Pony Labelrite, was used by Matherson-Selig Company to manufacture fabric sample charts. Defendant in its brief seems to attribute some significance to this fact in determining the presence of anticipation. But the law is clear that the existence of a machine does not affect the validity of a process using that machine, as product patents are distinct from process patents and may exist and be sustained independently of them. Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 29 S.Ct. 495, 53 L. Ed. 805 (1909); Philip Sitton Septic Tank Co. v. Honer, 274 F.2d 811 (10th Cir. 1959); McDaniel v. Friedman, 98

---

1. Defendant also cites as prior art which it deems pertinent certain alleged prior public uses of the Neer process by the Charles Green and Taylor Box companies, but as will be explained later, these alleged prior public uses are not established by clear and convincing evidence and cannot therefore be considered as prior art references.

F.2d 745 (7th Cir. 1938). The term "process," by statutory definition, includes a new use of a known machine. Title 35 U.S.C. § 100(b).

The third patent relied upon heavily by the patent examiner was the Australian Walsh patent. This patent deals with a machine for preparing sample cards for paints, fabrics and other materials. These materials are placed into a plurality of hoppers and then pressed by mechanical means into contact with a sample card to which adhesive has been applied. The use of a paper backing is suggested, but the use of such air impermeable material was apparently for stiffening purposes and to facilitate handling and not to improve suction.

The only other patent which is pertinent is the Booty patent. This patent was not relied upon by the examiner in the prosecution of the patent application but was merely made of record. It deals with a method of and apparatus for applying fabrics or other porous materials to mounting sheets by means of suction. Into a plurality of hoppers are placed a stack of fabric swatches which are alternated in the hoppers with sheets of air impervious material, the purpose of the latter being to provide a seal for the suction head which is placed against the fabric itself and behind which is located the air impervious material.

■ Plaintiff contends that the Booty patent does not anticipate the Neer process because the Booty patent discloses the use of suction but it does not employ a laminated tab or segment made of air permeable and air impermeable materials adhesively secured together and that were the materials in Booty so secured, the device could not operate in the manner taught. It must be remembered, however, that "the test of obviousness is not express suggestion of the claimed invention in any or all of the references but rather what the references taken collectively would suggest to those of ordinary skill in the art." Application of Rosselet, 347 F.2d 847, 52 CCPA 1533 (1965).

■ The Booty patent does not attempt to solve the problem of facilitating the handling of fabrics which are to be placed on a sample card. Further, it does not appear that the Booty process was put to practical use to any extent. "That this should be considered on the question of anticipation is settled. Deering v. Winona Harvester Works, 155 U.S. 286, 302, 15 Sup.Ct. 118, 39 L.Ed. 153" (1894). Atlantic, Gulf & Pacific Co. v. Wood, 288 F. 148 (5 Cir. 1923). Also see Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401 (7th Cir. 1950), and Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 420, 421, 22 S.Ct. 698, 705, 46 L.Ed. 968 (1902), wherein the United States Supreme Court said:

"* * * [I]f the Deighton patent had been adaptable to the Jones process, it is scarcely possible that its merits should have failed to seize upon the attention of manufacturers, who would have brought the patent into general use, instead of allowing it to lapse * * *."

This is particularly true where, as here, there was a great demand for fabric sample charts and, consequently, for a new, improved process of manufacturing them.

For the various reasons set forth above, the court does not feel that any of the aforementioned patents, when considered individually, anticipates the Neer process.

■■ In addition to a consideration of these patents individually, certain combinations of them were considered by the patent examiner and are relied upon by defendant as showing anticipation. It is well settled that prior references may be combined to establish anticipation (Crane Packing Co. v. Spitfire Tool & Machine Co., 276 F.2d 271 (7th Cir. 1960), but the prior references which are combined must suggest the combination itself and not merely all of the elements which make up the com-

bination. As stated in Deller's Walker on Patents, 2d Edition § 72 at 335, 6:

" * * * [I]n determining whether an invention has been made, references may be combined for the purpose of showing that it did not amount to invention to combine features of the prior art patents in the manner accomplished by the subsequent inventor. * * * "

* * * * * *

"The mere fact that the individual steps of an alleged invention are taught by several references does not of itself negative patentability; it must still be determined whether the combination of steps would have been obvious to an ordinary skilled worker in the art."

Also see Application of Mapelsden, 329 F.2d 321, 51 CCPA 1123 (1964), and Application of Reynaud, 331 F.2d 625, 51 CCPA 1310 (1964). Further, "[i]n order for one to defeat a meritorious patent it is not enough," said Judge Perry in Eversharp, Inc. v. Fisher Pen Co., Inc., 204 F.Supp. 649, 662–663, (N.D.Ill.1961), "to pick out isolated features in earlier prior art patents, combine them in one particular way with hindsight acquired only from the patent under attack, and then say that no invention would have been involved in selecting those particular features and combining them in the particular way in which the patentee did."

■■ The Neer process consists of a combination of interrelated steps, including the adhesion of air impermeable material to fabric, cutting the prepared rolls of backed fabric into swatches and loading them into hoppers, withdrawing them from the hoppers by suction, applying adhesive to them, and clamping them to a card. In order for anticipation to be found, the prior patents when combined must therefore suggest this combination and not merely the individual steps, for it is the combination and not the individual steps that comprises the invention. See Zero Manufacturing Co. v. Mississippi Milk Producers Association,

358 F.2d 853 (5th Cir. 1966); Blaw-Knox Company v. I. D. Lain Company, 230 F.2d 373 (7th Cir. 1956); Multi-fastener Corporation v. Ladd, 229 F. Supp. 46 (D.C.1964). Also, the fact that the combination of elements constituting the patent is found in a number of different patents in the same art may be considered in determining whether invention or mere mechanical skill was involved. Hall v. Wright, 240 F.2d 787 (9th Cir. 1957).

The combination of patents consistently relied upon by the patent examiner throughout the prosecution of the patent application as establishing anticipation but which the examiner abandoned prior to allowance of the final requested claim consists of the Von Hofe, McKay, and Walsh patents.

As previously pointed out, Von Hofe involves the use of suction to pick up labels from a plurality of hoppers, but such operation is used only in connection with air impermeable labels. McKay also involves the use of suction to pick up air impermeable materials (e. g., paint chips) from a plurality of hoppers. Neither patent then is concerned with or suggests the withdrawal of an air permeable fabric from a hopper by means of suction. Further, the Walsh patent, although it involves the use of air impermeable backed fabrics, does not deal with or suggest the use of suction. The means by which the backed swatches are applied to cards is rather by mechanical means whereby a movable table provided with plungers is caused to rise so that the contents of each magazine are pressed against a card. The patent expert called by plaintiff Jack Shore, testified that it would not be obvious to use the backed fabric suggested by Walsh in the structure of Von Hofe since Walsh was not aware of the problems faced in using suction. The court is also of the opinion that a combination of the Walsh, Von Hofe, and McKay patents does not anticipate the Neer process.

The Booty patent, either by itself or in combination with the Walsh patent, is

the most pertinent reference. While the nonobviousness of the Neer process does not remain entirely free from doubt when considered in light of Booty or Booty and Walsh together, the court is not persuaded that the Neer process would have been obvious at the time the invention was made to a person having ordinary skill in the art. It is true that Booty by itself or in combination with Walsh suggests the essential elements combined in the Neer process. It is also true that Mr. Richard Tank and Mr. Richard Dede, service and sales engineers respectively with the company that supplied Matherson-Selig with the machines it used to make sample charts, testified for defendant that in their opinion the application of a paper backing to a fabric swatch was obvious at the time of the Neer invention. However, there are other countervailing considerations which persuade the court that the Neer process was not obvious.

 First of all, the law is clear that while secondary considerations such as commercial success, long felt but unsolved need, and the failure of others, cannot supply the quality of "invention" requisite to patentability, they may however in a case of doubt, such as this, be decisive. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed. 2d 545 (1966); Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235 (1948); Textile Machine Works v. Louis Hirsch Textile Machines, Inc., 302 U.S. 490, 58 S.Ct. 291, 82 L. Ed. 382 (1938); Continental Can Co. v. Anchor Hocking Glass Corp., 362 F.2d 123 (7th Cir. 1966); A R, Inc. v. Electro-Voice, Incorporated, 311 F.2d 508 (7th Cir. 1962). The evidence is clear that prior to the Neer invention there was a great demand for fabric sample charts and a consequent need for an improved method of fabric sample chart manufacture, that other methods were tried but proved unsuccessful, that the Neer process was commercially successful and responsible for a tremendous increase in business, and that the Neer process is the commercially accepted method of manufacturing fabric sample charts today.

 Second, while there was testimony by two employees of the New Jersey Machine Corporation that the Neer process was obvious, the court views such testimony as merely a retrospective view that the Neer conception seemed simple and must therefore have been obvious. This type of retrospective analysis is not decisive in determining whether or not a process was obvious. As stated in Application of Reynaud, *supra*, 331 F.2d at 627:

> " ' * * * "Hindsight" is not a proper basis for determining patentability. While a particular solution to a problem may seem simple in retrospect, after its disclosure, foresight applied as of the date of the invention is the only proper test of invention. * * * ' "

That Mr. Tank and Mr. Dede took a retrospective view of the problem is emphasized by the testimony of Mr. Neer, the inventor, to the effect that immediately prior to his invention, in the latter part of 1953, he called upon the service men at the New Jersey Machine Corporation for help in solving the problems he had encountered in trying to discover a successful means of applying fabric swatches to a sample card and that the people there stated they had no experience with fabric sample charts and could only suggest applying more vacuum to the nonbacked fabric swatches. Certainly if the adhesion of a paper backing to the fabric was as obvious as Mr. Dede and Mr. Tank now say it was, it is likely that the service personnel at their company would have come up with this suggestion, rather than the useless one of applying more vacuum.

Finally, as evidence of nonobviousness, there is the testimony of plaintiff's patent expert, Jack Shore, that nowhere in the prior art is there the real appreciation of the problem of applying fabrics to sample cards by suction and that no prior patent suggests a solu-

tion for handling permeable and impermeable materials adhesively secured, having different physical characteristics, and mounting them on a sample chart. There is his further testimony that in his opinion there is no combination of prior patents that would enable one skilled in the art to anticipate the Neer process.

The court therefore concludes that the Neer patent is valid as against the attack of anticipation and prior art inasmuch as defendant has failed to establish by clear and convincing evidence that the Neer process was obvious at the time the invention was made to a person having ordinary skill in the art.

*Prior Public Use*

Defendant's second ground for asserting invalidity of the Neer patent is the defense of prior public use. It contends that, as early as 1936, paper-backed fabrics were withdrawn from a hopper by suction and mounted and that such prior public uses are documented by the files of the companies which allegedly practiced the Neer process, the Charles Green Company and the Taylor Box Company. Plaintiff, on the other hand, contends that defendant's evidence of prior public use is circumstantial at best and that even assuming the Charles Green Company and the Taylor Box Company practiced the Neer process, their practice was experimental and not commercial and did not therefore amount to a prior public use. Plaintiff also placed reliance on the fact that defendant's witnesses, Mr. Dede and Mr. Tank, are employees of a real party in interest, the New Jersey Machine Corporation, which would benefit from a decision of patent invalidity,[2] and that their testimony should therefore be closely scrutinized.

The law relating to defendant's burden of proving a prior public use has been stated by the United States Supreme Court, as follows:

" * * * The temptation to remember in such cases and the ease with which honest witnesses can convince themselves after many years of having had a conception at the basis of a valuable patent, are well known in this branch of law, and have properly led to a rule that evidence to prove prior discovery must be clear and satisfactory." Eibel Process Company v. Minnesota and Ontario Paper Company, 261 U.S. 45, 60, 43 S.Ct. 322, 327, 67 L.Ed. 523 (1923).

See also Julian v. Drying Systems Co., 346 F.2d 336 (7th Cir. 1965), which requires that a prior public use be established by "clear and convincing" proof. It is further stated in Deering v. Winona Harvester Works, *supra*, 155 U.S. at 300–301, 15 S.Ct. at 123, 39 L.Ed. 153:

* * * [O]ral testimony, unsupported by patents or exhibits, tending to show prior use of a device regularly patented is, in the nature of the case, open to grave suspicion. *The Barbed Wire Patent*, 143 U.S. 275 [12 S.Ct. 443, 36, 450 L.Ed. 154, 1892]. Granting the witnesses to be of the highest character, and never so conscientious in their desire to tell only the truth, the possibility of their being mistaken as to the exact device used, which, though bearing a general resemblance to the one patented, may differ from it in the very particular which makes it patentable, are such as to render oral testimony peculiarly untrustworthy; particularly so if the testimony be taken after the lapse of years from the time the alleged anticipating device was used. If there be added to this a personal bias, or an incentive to color the testimony in the interest of the party calling the witness, to say nothing of downright perjury, its value is, of

---

**2.** Presumably, the company would benefit because if there was no patent on the Neer process, sale of the Pony Labelrite machine, which is manufactured by it, to other companies, who would otherwise at least have to pay royalties to plaintiff to use their process, would be a natural result.

course, still more seriously impaired. This case is an apt illustration of the wisdom of the rule requiring such anticipations to be proven by evidence so cogent as to leave no reasonable doubt in the mind of the court, that the transaction occurred substantially as stated.

 If defendant makes a prima facie case of prior use, the burden of proof then shifts to plaintiff. Thus, "once a prima facie demonstration of the claimed use has been made, the inventor carries the burden of showing that the use was not of a functionally operative device, or was substantially used for experimentation or testing purposes and this must be demonstrated by strong and convincing proof." Atlas v. Eastern Air Lines, Incorporated, 311 F. 2d 156 (1st Cir. 1962). Also see McCullough Tool Company v. Well Surveys, Inc., 343 F.2d 381 (10th Cir. 1965); National Biscuit Co. v. Crown Baking Co., 105 F.2d 422 (1st Cir. 1939). The fact that the burden may shift after a "prima facie demonstration" of the claimed prior public use does not alter defendant's burden of establishing the prior public use by evidence which is clear and satisfactory and leaves no doubt in the mind of the court. A prima facie case then is established only when the evidence of the alleged prior public use is clear and satisfactory evidence which, if unrebutted, would be sufficient to support a verdict in favor of the party by whom it is introduced. Defendant has here failed to make a prima facie showing of the claimed prior public use and the burden of evidence therefore never falls upon the patentee to prove that the use was experimental.

Defendant alleges that, as early as 1936, paper-backed fabric was withdrawn from hoppers by suction and mounted on sample cards at the Charles Green Company and the Taylor Box Company. In support of this claim, it introduced the testimony of Mr. Tank and Mr. Dede who, as stated before, were service and sales managers respectively at New Jersey Machine Corporation during the period of these claimed uses, and who are now sales and service manager and executive vice president respectively of the company. New Jersey Machine Corporation is the company that manufactures the machines which plaintiff uses to manufacture its paper-backed sample cards and which the Charles Green Company and the Taylor Box Company allegedly also used to manufacture paper-backed sample cards. As already indicated, the New Jersey Machine Corporation and Mr. Tank and Mr. Dede would have something to gain by a declaration of the invalidity of the Neer patent and they must therefore be considered real parties in interest whose testimony must be subjected to particularly close scrutiny. Also in support of its claim of the alleged prior public use, defendant has introduced certain documentary evidence from the files of the Charles Green Company and the Taylor Box Company.

In evaluating whether or not this evidence establishes a prior public use, the court notes the definition of a public use set forth by the United States Supreme Court in Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071 (1938), and reiterated by the Tenth Circuit Court of Appeals in McCullough Tool Co. v. Well Surveys, Inc., supra, 343 F.2d at 394:

> "Public use is defined as '* * * [t]he ordinary use of a machine or the practice of a process in a factory in the usual course of producing articles for commercial purposes * * *.'"

As to the alleged prior public use at the Charles Green Company, Mr. Dede testified that the New Jersey Machinery Corporation in 1936 sold a Pony Labelrite machine to the Charles Green Company for the purpose of picking up paper backed fabrics by suction and applying them to various articles and that the Pony Labelrite machine performs the Neer process. Mr. Dede, who was not an employee of the company until June, 1937, and never personally saw the Green Company machine, stated that he based his testimony on certain company rec-

ords which he was responsible for maintaining and which were taken from the engineering record vault. There is no doubt that the New Jersey Machine Corporation sold a Pony Labelrite machine, model number 86 M, to the Charles Green Company, which was capable of practicing a process of applying paper backed fabrics to sample charts. However, it is equally clear that such machine was also capable of handling, and did in fact handle, air impervious paper labels. Therefore, the mere fact the Green Company had such a labeling machine is of no consequence in proving that it was put to one of two possible uses.

Dede referred to a blueprint of three different sized label support plates to be used on the Pony Labelrite machine, to a change parts order directing that three sets of change parts for flat labeling be made and listing three different label sizes (the third being for a "cloth face" of a designated size), and to an envelope containing what appears to be samples to which the change parts order refers. The samples consist of two paper labels and one paper-backed cloth swatch whose dimensions, which are marked on the samples themselves, match the label sizes listed in the change parts order and are referred to therein. The samples, which were not definitely on hand at the time the blueprints were made but which it was customary to have on file at that time, were not actually run by the Green Company machine, but, rather, furnished as samples to the New Jersey Machine Corporation by the Green Company.

Mr. Tank testified that he saw this Pony Labelrite machine, model number 86 M, at the Green Company in 1936 in commercial production with paper-backed textile materials and with paper labels.

As to the alleged prior public use at the Taylor Box Company, Dede testified that a Pony Labelrite machine, model number 86 ML, was also sold, in 1939, to the Taylor Box Company, subsequent to the sale of the machine to the Green Company, also for the purpose of picking up paper-backed textile materials, and that he saw the machine at this company pick up paper-backed velour material and place it on top of a small box. He further said that to his personal knowledge the Taylor Box Company did not use any machine to manufacture fabric sample charts. He stated on direct examination that the machine was in commercial production. On cross-examination, however, when asked how he knew there was a commercial run he stated, "Box makers don't produce stuff in quantity as a rule just for the fun of destroying material." Dede referred to certain samples submitted by a Mr. Scholes, the man from the Taylor Box Company who placed the order for the Pony Labelrite machine, contained in an envelope kept in the engineering record vault. He referred to the materials contained therein as a metallic seal, a piece of foil, and a piece of paperbacked velour material. He also referred to a change parts order,[3] dated February 24, 1939, which spoke of an aluminum mouthpiece platen for applying a 2-9/16" x 2-3/16" velour to a 1-13/16" x 2-3/4" x 3" box, of a velour support plate, and of other parts to handle other sized labels, including various foil labels. Finally, of significance, he referred to a service report made out by Mr. Tank, dated March 16, 1939, March 17, 1939, March 23, 1939, and March 24, 1939, which states that Mr. Tank demonstrated a model number 86 ML at the Taylor Box Company and also states, among other things, that the velvet box top labeling was very hard to register perfectly because the staggering of this material in the label hopper was difficult.

Mr. Tank testified that he made service calls on the Taylor Box Company on March 16, 17, 23 and 24 of 1939 and November 21 of 1941 and that he saw the Pony Labelrite machine running with paper-backed velour material in a commercial run. Upon cross examination,

3. When a customer orders a machine certain basic information is required. A change parts order refers to an order specifying the additional information which would allow that machine to handle specific products of different sizes.

however, he stated that he did not know whether the run was for commercial or demonstration purposes. He said, "I wouldn't know, naturally, I couldn't know, because we just run the machine. Who would expect something like this to pop up after 30 years."

Further, both Mr. Tank and Mr. Dede testified that they were not aware of any advertising by their company that shows the Pony Labelrite machine as capable of handling fabrics.

Finally, of relevance to the issue of prior public use, is the testimony of Mr. Neer, Mr. Tank, and Mr. Dede concerning New Jersey Machine Corporation's awareness of the use of air impermeable backed fabrics with the Pony Labelrite machine. As previously pointed out, Mr. Neer testified that he contacted the service personnel of the New Jersey Machine Corporation in the latter part of 1953 to determine if they could help solve the problems encountered in using the Pony Labelrite machine in connection with air pervious fabrics. He was told that they had no experience with fabric swatching, that they felt only a nonporous sheet could be picked up, and that their only suggestion was to apply more vacuum to the fabrics. Mr. Dede and Mr. Tank testified that they knew and that it was recognized by their company prior to 1953, and in fact even prior to the sale of the Pony Labelrite machine to the Charles Green Company in 1936, that porous cloth had to be paper-backed in order to be picked up by a vacuum-type machine such as the Pony Labelrite. If the New Jersey Machine Corporation was not aware of the use of paper backing as late as 1953, it is improbable that they sold a Pony Labelrite machine to certain companies as early as 1936 for use with porous fabrics inasmuch as the machine was totally ineffective unless used with such backed fabrics.

The court does not believe that this evidence of prior public use proves clearly and convincingly either that there was a prior public use of plaintiff's process or that such use was public.

## INFRINGEMENT

### Doctrine of Equivalents

Defendant contends that even if the Neer process is valid, it does not infringe it because its process differs substantially from plaintiff's.

The parties have stipulated that a certain graphic chart, identified as defendant's Exhibit F, represents an accurate comparison of the steps of the patented Neer process with that of defendant's alleged infringing process. Comparing the steps of their processes, the parties have agreed that steps one through three of defendant's process correspond with steps one through three of plaintiff's process and that steps eight through ten of defendant's process correspond with steps seven and eight of plaintiff's process.

Steps four through six of plaintiff's process deal with that portion of the patent claim language which reads:

A method of fabricating a sample chart * * * said method comprising * * * contacting the outer sides of the tabs in said hoppers with ports of a suction head to lift one tab from each hopper.

In these steps of the patented process, the suction head, which is placed *above* the loaded hoppers, *lowers* itself into contact with the fabric side of the tabs, then rises upward with the tabs, and thereafter moves across the glue roller. In defendant's alleged infringing process a suction head, which is placed *below* the loaded hoppers, *raises* itself into contact with the air impervious side of the tabs, then lowers itself with the tabs, moves from under the hoppers into contact with another suction head positioned immediately above it, and transfers the tabs to this second suction head which then moves across the glue roller. The only difference between the two processes then is that defendant's process has an additional transfer step whereby the tabs are initially removed from the bottom of the hoppers and then transferred to a second suction head.

Defendant alleges that this additional step makes its process substantially different from plaintiff's process. It is true that its process does not literally read upon plaintiff's process.[4] However, whether or not the claim of an alleged infringing process literally reads upon the claim of another process is not the test of infringement. The test and the reason for it are thoroughly set forth by the United States Supreme Court in Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605 at 607–610, 70 S.Ct. 854, at 855, 94 L.Ed. 1097 (1959):

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

"The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 15 How. 330 [56 U.S. 330, 14 L.Ed. 717], it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. 'To temper unsparing logic and prevent an infringer from stealing the benefit of an invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42 [50 S.Ct. 9, 74 L.Ed. 147]. The theory on

4. First of all, referring to the "outer" side of the tab as the side of the tab with the fabric on it (as opposed to the inner or under side), in defendant's process the suction head does not come into contact initially with the "outer sides of the tabs." However, it is unlikely that "outer" side refers to the fabric side per se because in the patent claim the language, "back sides" of the tabs is specifically referred to as those sides on which the paper backing is adhered. To be consistent, if the patentee was referring to the fabric side, then he would most likely have used the words "front sides of the tabs" rather than the words "outer sides of the tabs." More properly, "outer sides" refers to those sides which are exposed or on the outside. In this sense, the outer side would be contacted in both processes. Defendant's argument that "outer sides" refers to the topmost, upwardly facing sides is not acceptable. As will be understood later, whether "outer" side refers to the fabric side or the exposed side is of no consequence to the outcome of this case. Moreover, in defendant's process the suction head does not "lift" or raise the tabs from the hoppers. It rather draws the tabs downward from the hopper. Finally, defendant's process involves what might be called an additional transfer step whereby the tabs are transferred from the suction head, which initially withdraws them from the hoppers, to a suction head that moves them across the glue roller.

which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' [Union Paper Bag] Machine Co. v. Murphy, 97 U.S. 120, 125 [24 L.Ed. 935]. The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results, Imhaeuser v. Buerk, 101 U.S. 647, 655 [25 L.Ed. 945], although the area of equivalence may vary under the circumstances. See Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 414–415 [28 S.Ct. 748, 749, 52 L.Ed. 1122], and cases cited; Seymour v. Osborne, 11 Wall. 516, 556 [78 U.S. 516, 20 L.Ed. 33]; Gould v. Rees, 15 Wall. 187, 192 [82 U.S. 187, 21 L.Ed. 39]. The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568 [18 S.Ct. 707, 722, 42 L.Ed. 1136]. * * *

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

"A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence."

These principles have been repeatedly adopted by the Seventh Circuit Court of Appeals.[5]

▆▆▆▆ Thus, varying the details of a process, as by adding a step or splitting one step into two does not avoid infringement, where the processes are substantially identical or equivalent in terms of function, manner, and result. Universal Oil Products Co. v. Globe Oil and Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); Ace Patents Corporation v. Exhibit Supply Co., 119 F.2d 349 (7th Cir. 1941); King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc., 354 F.2d 533 (10th Cir. 1965). Identity of the apparatus used for executing the processes is not material in itself. National Lead Company v. Western Lead Products Co., 324 F.2d 539 (9th Cir. 1963).

5. See Skirow v. Roberts Colonial House, Inc., 361 F.2d 388 (7th Cir. 1966); Ekco Products Co. v. Chicago Metallic Manufacturing Co., 321 F.2d 550 (7th Cir. 1963); Elgen Manufacturing Corporation v. Ventfabrics, Inc., 314 F.2d 440 (7th Cir. 1963); Howe v. General Motors Corporation, 252 F.Supp. 924 (N.D.Ill. 1966).

A careful review of the patent and the prior art leads this court to the inescapable conclusion that defendant's alleged infringing process is substantially the equivalent of plaintiff's process. As has been pointed out, a portion of defendant's process is different in form from plaintiff's process, i. e., in defendant's process the suction head approaches the hoppers from the *bottom* and draws the tabs to a second suction head which moves across the glue rollers. Also, in terms of literally reading upon plaintiff's process, it has been seen that defendant's process does not lift the tabs from the hoppers and that it embodies an additional transfer step which is not included in plaintiff's single claim. However, as the law makes clear, the test of equivalency is not based on a comparison and identity of form or literal reading of one claim upon another, but rather upon a comparison and identity of function, manner and result. The question here therefore is whether the removal of the air impervious sides of the tabs from the *bottom* of the hoppers and the addition of a transfer step, in view of the patent and prior art and under the particular circumstances of this case, is a change of such substance as to make the doctrine of equivalents inapplicable. The court thinks not.

The function of steps four through seven in defendant's process is the withdrawing of the tabs from the hoppers; the function of steps four through six in plaintiff's process is also the withdrawing of the tabs from the hoppers. Further, both processes achieve the same results, namely, manufacture of a fabric sample chart. The unrebutted testimony of Ernst Karlsson, President of defendant corporation, and Jack Shore, plaintiff's patent expert, is that the two processes are the equivalent in terms of function, manner, and result. What the United States Supreme Court said in the *Graver* case, *supra*, 339 U.S. at 612, 70 S.Ct. at 858, is applicable here: " * * [T]he trial court could properly infer that the accused flux is the result of imitation rather than experimentation or

invention. Though infringement was not literal, the changes which avoid literal infringement are colorable only."

*File Wrapper Estoppel*

■ Defendant contends, however, that the doctrine of equivalents is not available to plaintiff because the doctrine of file wrapper estoppel supersedes it and preludes its application. That this is the rule is true. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942); Keating v. Stearnes Imperial Co., 347 F.2d 444 (7th Cir. 1965); Ekco Products Co. v. Chicago Metallic Manufacturing Co., 347 F.2d 453 (7th Cir. 1965).

■ How the doctrine of file wrapper estoppel is applied and the effect of its application were recently reiterated by the United States Supreme Court in Graham v. John Deere Co., *supra,* 383 U.S. at 33, 86 S.Ct. at 702, 15 L.Ed.2d 545:

"It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. Hogg v. Emerson, 11 How. 587 [52 U.S. 587, 13 L.Ed. 824] (1850); Crawford v. Heysinger, 123 U.S. 589 [8 S.Ct. 399, 31 L.Ed. 269] (1887). Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. Powers-Kennedy [Contracting Corp.] v. Concrete [Mixing & Conveying] Co., 282 U.S. 175, 185–186 [51 S.Ct. 95, 99, 75 L.Ed. 278] (1930); Schriber [Schroth] Co. v. Cleveland Trust Co., 311 U.S. 211, 220–221 [61 S.Ct. 235, 239–240, 85 L.Ed. 132] (1940).

But file wrapper estoppel will arise only where that element of the claim which the defendant seeks to prevent the pat-

entee from broadening or narrowing was amended in order to avoid rejection.[6] As stated by the Seventh Circuit Court of Appeals in Taylor-Reed Corporation v. Mennen Food Products, Inc., 324 F.2d 108 (1963): " 'File wrapper estoppel arises only through amendment and cancellation of claims to overcome rejection, and the court will look no further than to learn whether the patentee seeking to disavow an element of his claim was forced to introduce such element to avoid rejection.' " Also see Catalin Corporation of America v. Catalazuli Mfg. Co., Inc., 79 F.2d 593 (2nd Cir. 1935); Ekco Products Co. v. Chicago Metallic Manufacturing Co., *supra;* Sears, Roebuck & Co. v. Jones, 308 F.2d 705 (10th Cir. 1962), and Walt Disney Productions v. Fred A. Niles Communication Center, Inc., 253 F.Supp. 1 (N.D.Ill.1966). Thus, in determining whether the doctrine of file wrapper estoppel is applicable, the reason for the rejection of a particular claim must be determined. If it was rejected because a particular aspect of the claim was too broad or too narrow in light of the prior art, then, as to the subsequent claim which is accepted, the patentee will be estopped from obtaining a breadth of construction equal to that contained in the cancelled claim. The patentee is estopped only from claiming and recapturing that which he surrendered by amendment to gain acceptance of his claim by the patent examiner.

It is defendant's position that rejected claims 6 and 7 in plaintiff's patent application were not limited to top withdrawal, that claim 13, which was the claim that was finally accepted, was limited to top withdrawal, and that plaintiff is therefore estopped from asserting that its patent covers both top and bottom withdrawal. As stated before, the mere fact the rejected claims included both top and bottom withdrawal and that the claim which was finally accepted referred only to top withdrawal is not by itself conclusive of the fact that file wrapper estoppel is applicable to estop plaintiff from claiming a scope of withdrawal equal to that in the rejected claims.

The questions here are why were claims 6 and 7 rejected and was the patentee forced to limit the means of withdrawal to avoid the prior art and thus rejection. After analyzing the file wrapper history of the Neer patent, the court concludes that claims 6 and 7 were rejected for reasons other than that the means of withdrawal were too broad and that the patentee was not forced to limit the means of withdrawal to avoid rejection.[7]

6. Although file wrapper estoppel is most frequently invoked where the original and cancelled claim is broader than that allowed, the rule and the reason for it are the same if the cancelled or rejected claim is narrower. See Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940).

7. Claim 6. In a method of handling air pervious material, the steps of bonding a substantially air impervious layer to one side of a section of said material, then cutting the section into tabs, then stacking the tabs with the layer on each abutting an adjacent tab on the side thereof remote from its layer, and then removing the tabs from the stack one at a time by applying vacuum thereto.

Claim 7. In a method of handling air pervious material, the steps of applying thereto a substantially air impervious layer fixed to one side only of said material, then cutting the material into tabs, then stacking the tabs, and then removing the tabs from the stack one at a time by intermittently applying a vacuum thereto.

Claim 13. A method of fabricating a sample chart having a backing to which are adhesively secured a plurality of air permeable tabs of various physical characteristics, said method comprising applying air impermeable layers to the back sides of a plurality of segments of air permeable material having, respectively, different physical characteristics, then cutting said segments into tabs and loading the tabs of respective segments into separate hoppers with the back sides of said tabs facing inwardly of the hoppers, contacting the outer sides of the tabs in said hoppers with ports of a suction head to lift one tab from each hopper, applying

Nowhere in the prosecution of the Neer patent before the patent office is there any reference by the patentee or the examiner to a specific means of withdrawal. In the examiner's office action paper number seven, dated March 21, 1956, it is stated that claims 1 to 7 are rejected as unpatentable over Von Hofe in view of Walsh when taken with McKay, et al. As can be seen from the rest of the examiner's remarks and patentee's attorney's comments in a letter to the examiner, dated July 20, 1956, the examiner at this point did not believe that the proposed invention was nonobvious. The basis of his rejection was not that the means of withdrawal were too broad but rather that the patent was not obvious in regard to its use of suction to apply air impermeable backed fabrics to a sample card. He believed that in view of other patents which used suction to apply labels to bottles and suction to apply other air impermeable matters to sample charts and in view of other patents which taught the use of paper-backed fabrics, the Neer patent was not obvious. There was no suggestion that the claims were rejected because other patents already covered bottom withdrawal and that patentee would therefore have to limit his claim to top withdrawal if he was to receive a patent. As a matter of fact, of the three prior art references which the examiner primarily relied upon, only the McKay patent involves bottom withdrawal. Both Walsh and Von Hofe incorporate top withdrawal. Further, nothing in the subsequent office action papers of the examiner or letters of patentee's attorney [8] is related to the means of withdrawal. All discussion is related to the suction or paper backing aspects first mentioned in the examiner's office action paper number five, dated March 21, 1956.

Further, there are significant differences between claims 6 and 7 and claim 13 other than the means of withdrawal and these are adequately pointed up by patent expert, Jack Shore, in his deposition. First, the claim in suit, in its initial portion, calls for fabricating a sample chart, while this is not referred to in either claim 6 or claim 7. Claims 6 and 7 are broader and refer generally to a method of handling air pervious material.[9] Second, claim 13 refers to backing air permeable materials having different physical characteristics, while claims 6 and 7 do not make any such reference. Third, claim 13 refers to the specific way in which the tabs should be loaded into the hoppers, while claims 6 and 7 merely refer to stacking the tabs, without further details. Finally, claim 13 refers to the details of applying adhesive to the tabs and clamping the tabs to a backing sheet, while claims 6 and 7 do not make any reference to these steps.

Also, as indicative of the inapplicability of file wrapper estoppel, there is the fact that other claims proposed by the patentee in the patent application embodied the limited means of top withdrawal.[10] Certainly, as plaintiff points out in his trial brief, if this feature was the invention, these other claims would have been allowed.

The remarks of the Circuit Court of Appeals in a similar situation in Sears, Roebuck & Co. v. Jones, supra, 308 F.2d at 708, seem appropriate here:

"* * * [A]ppellants assert the 'Doctrine of File Wrapper Estoppel,'

adhesive to the back sides of the tabs carried by the head and then clamping the back sides of the tabs carried by said head against the backing sheet to adhesively secure the last-mentioned tabs thereto.

8. This would include patentee's attorney's letter dated July 20, 1956, the examiner's office action paper number seven, dated January 18, 1957, and patentee's attorney's letter dated April 23, 1957.

9. This might be a good example of when the doctrine of file wrapper estoppel is applicable. Since the file wrapper history clearly indicates that patentee's claim is only for a method of fabricating a sample chart, patentee might be estopped from claiming a method that includes something other than the fabrication of a sample chart.

10. Specifically, claims one through five and claims 11 and 12.

i. e., that in the prosecution of his patent within the Patent Office, Jones cancelled certain rejected claims, accepted narrower claims in their stead, and is now estopped from obtaining a breadth of construction as broad as that contained in the claims voluntarily cancelled. We have recognized and applied this doctrine on several occasions. * * * In these cases, however, the patentee limited his claim to a specific structural detail in view of the disclosures of prior art; argued and represented that the structural detail defined in his claims constituted the distinguishing feature of his patent over prior art; and issued his patent only with claims limited to such structural detail, thus acquiescing in the Patent Office rejections based on prior art disclosure. Jones' difficulty with the Patent Office did not result from any prior art similarities which had to be resolved by the limitation of his inventive claims to structural differences. Rather, Jones' attorneys had difficulty in wording claims acceptable to the Patent Office and the rejection of claims was based on 'indefiniteness.' The claims in suit solved Jones' problem of 'indefiniteness' and since Jones did not, by representation or acquiescence, limit his patent to the specific structure of a release lever pivoted on the movable handle, we find no estoppel."

Finally, defendant argues that on page 30 of the file wrapper history, there appears the handwritten note of the examiner that reads as follows: "Interview Mr. Schlegel, Jr. 4–10–57—will allow single restricted claim," that this interview was apparently the interview between patentee's attorney's associate counsel, referred to on page 25 of the file wrapper history, and that "restricted" refers to the limited means of withdrawal. Plaintiff contends that this no-

tation is not an official action, an argument or an amendment, but an extraneous remark at best which may not limit the invention. The cases plaintiff cites for this proposition stand more strictly for the proposition that the terms of a claim should not be limited or extended by mere extraneous remarks of the *applicant* in argument without an actual amendment of the claim to that effect. See Bassick Co. v. Faultless Caster Corporation, 105 F.2d 228 (7th Cir. 1939). But even assuming such remarks may be considered on the issue of file wrapper estoppel, there is the question of whether they have the effect of limiting the means of withdrawal. There is no reason, in light of the instant file wrapper history, to believe that "restricted" refers to a limited means of withdrawal; rather, such remark apparently refers to the method of fabricating a sample chart described in claim 13 as opposed to the broader method of handling any air pervious material covered by the withdrawn claims 6 and 7.

## CONCLUSION

The court finds that the subject matter of the patent was not obvious at the time the invention was made within the meaning of Title 35 U.S.C. § 103 and that there was no prior public use within the meaning of Title 35 U.S.C. § 102. It further finds that defendant's process is the equivalent of plaintiff's process and that plaintiff is not estopped from applying the doctrine of equivalents. The court therefore concludes that the Neer patent is valid and has been infringed.

The court adopts as its findings of fact and conclusions of law those set forth in the body of this opinion. Rule 52(a), Federal Rules of Civil Procedure. Attorney for plaintiff may present an appropriate judgment order in accordance herewith.